# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| CALVIN WILLIAMS, | ) | CASE NO. 1:16CV00856 |
| | ) | |
| Plaintiff, | ) | JUDGE JOHN R. ADAMS |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION** |

Plaintiff, Calvin Williams ("Plaintiff" or "Williams"), challenges the final decision of

Defendant, Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner"),

denying his applications for Period of Disability ("POD"), Disability Insurance Benefits

("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI of the Social

Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").  This Court has jurisdiction

pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate

Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and

Recommendation.  For the reasons set forth below, the Magistrate Judge recommends that the

Commissioner's final decision be VACATED and the case REMANDED for further proceedings

consistent with this Report & Recommendation.

## I.  PROCEDURAL HISTORY

In March 2013, Williams filed applications for POD, DIB, and SSI, alleging a disability

1

onset date of May 27, 2009[1] and claiming he was disabled due to chronic low back pain with four bulging discs, back injury, and depression.  (Transcript ("Tr.") 19, 206, 230.)  The applications were denied initially and upon reconsideration, and Williams requested a hearing before an administrative law judge ("ALJ").  (Tr. 138-151, 154-165, 166.)

On February 5, 2015, an ALJ held a hearing, during which Williams, represented by counsel, and an impartial vocational expert ("VE") testified.  (Tr. 33-57.)  On March 6, 2015, the ALJ issued a written decision finding Williams was not disabled.  (Tr. 19-32.)  The ALJ's decision became final on February 26, 2016, when the Appeals Council declined further review.  (Tr. 1-4.)

On April 12, 2016, Williams filed his complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 15, 17.)  Williams asserts the following assignments of error:

> (1) The Administrative Law Judge erred in failing to grant appropriate weight to the opinion of the treating physician, resulting in an erroneous residual functional capacity assessment and failure to recognize Plaintiff's disability under the Medical-Vocational Guidelines.

> (2) The ALJ's assessment of Mr. Williams' Mental Functional Capacity is not supported by substantial evidence and requires remand.

---

[1] Williams filed previous applications on August 4, 2010 for Title II disability benefits and Title XVI supplemental security income, also alleging an onset date of May 27, 2009.  (Tr. 19.)  These applications were denied after a hearing by a different ALJ, in a decision dated January 26, 2012.  (*Id*.)  This denial was upheld by the Appeals Council on February 26, 2013.  (*Id*.)  In the instant case, the ALJ determined as follows: "Because a prior Administrative Law Judge decision was made on January 26, 2012, the doctrine of *res judicata* applies to a portion of the adjudicative period of the current Title II and Title XVI claims alleging disability beginning May 27, 2009. * * * **Therefore, this decision will apply to the unadjudicated period commencing January 27, 2012.**"  (*Id*.) (emphasis added).

(Doc. No. 15.)

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Williams was born in August 1962 and was fifty-two (52) years-old at the time of his administrative hearing, making him a "person closely approaching advanced age" under social security regulations.  (Tr. 27.)  *See* 20 C.F.R. §§ 404.1563(d) & 416.963(d).  He has a high school education and some college education, and is able to communicate in English.  (Tr. 27, 39.)  He has past relevant work as a heat treater, hand packager, cashier-checker, filter assembler, housekeeper, assistant manager, barn boss, and candy molder.  (Tr. 26-27.)

### B.    Relevant Medical Evidence

#### 1.    Physical Impairments

Williams was injured on May 27, 2009 while working as a heat treater.  (Tr. 289-291.) He was lifting a plastic liner full of water when he felt a "pull" in his lower back.  (*Id*.)  He did not seek emergency treatment.  (*Id*.)  Several weeks later, x-rays were taken which were negative for fracture.  (*Id*.) Williams was prescribed Flexeril and physical therapy.  (*Id*.)

On July 16, 2009, Williams began treatment with Satish Mahna, M.D.  (Tr. 289-291.) Williams reported "constant dull aching low back pain" which he rated a seven on a scale of ten, along with bilateral heel pain and tingling across his lower back.  (*Id*.)  He also complained that his right leg "wants to give out" "every now and then."  (*Id*.)  Examination revealed a nonantalgic gait, paravertebral tenderness at L2-3 and L4-S1 with mild muscle spasm, restricted range of motion, weakness of the bilateral hip and knee movers, no focal sensory deficit, 2+ and symmetrical deep tendon reflexes except for "sluggish right achilles reflex," equivocal straight

3

leg raise on the right and negative on the left.  (Tr. 290.)  Dr. Mahna diagnosed lumbosacral

sprain, sprain sacroiliac, and rule out L5-S1 disc pathology.  (Tr. 290-291.)

Williams presented to Dr. Mahna throughout the remainder of 2009 on a bi-weekly basis,

for a total of nine (9) visits.  (Tr. 292-309.)  At each examination, Williams complained of low

back pain and stiffness, as well as bilateral heel pain.  (*Id*.)  He also began to complain

intermittently of radiating pain into the right thigh down to his knee.  (*Id*.)  Williams generally

rated his pain between a seven and nine on a scale of ten.  (*Id*.)  Examination findings remained

unchanged throughout 2009, although Dr. Mahna added a diagnosis of possible L4-5 disc

pathology on July 30, 2009.  (*Id.*)

On December 23, 2009, Williams underwent an MRI of his lumbar spine.  (Tr. 311, 442.)

This MRI revealed (1) a 4 mm disc bulge with slight compression of the ventral dural sac at L3-4

along with bilateral neural foraminal narrowing, possible L3 nerve root impingement within the

foramina, and facet hypertrophy; (2) a 4 mm disc bulge at L5-S1 along with noncompressive

bilateral neural foraminal narrowing and facet hypertrophy; (3) disc dehydration with normal

configuration at L4-5 with facet hypertrophy; and (4) normal L1-2 and L2-3 discs.  (*Id*.)  Dr.

Mahha added diagnoses of L3-4 disc bulge and L5-S1 disc bulge.  (Tr. 313-315.)

Williams continued to present regularly to Dr. Mahha in 2010, seeing him on twenty-five

(25) occasions.  (Tr. 313-361.)  Williams consistently complained of chronic lower back pain

and stiffness with radiation into the bilateral thighs down to the knees, weakness in the lower

back and right leg, bilateral heel pain, and tingling across the lower back.  (*Id*.)  Beginning in

April 2010, Williams also reported pain and "pulling" in his left hip.  (Tr. 324-325.)  Dr. Mahna

prescribed Flexeril and Vicodin and, in June 2010, advised Williams to undergo a pain

4

consultation.  (Tr. 336-337.)  In August 2010, Williams asked for, and was provided, a back brace.  (Tr. 342-343.)  The following month, Dr. Mahna sought authorization for Williams to receive a series of lumbar epidural injections/blocks.  (Tr. 346-347.)  Authorization was received in October 2010 and Williams underwent lumbar injections on October 28, 2010 and November 11, 2010.  (Tr. 352-355.)  After his first injection, Williams reported experiencing relief for five days and rated his pain a seven on a scale of ten.  (Tr. 352-353.)  After his second injection, Williams rated his pain a four to five on a scale of ten.  (Tr. 354-355.)  In December 2010, Williams stated his "pain was down to a 6."  (Tr.  358-359.)  Treatment notes indicate he was wearing a back brace and a TENS unit, and had received authorization for 18 physical therapy visits.  (*Id*.)  Dr. Mahna's examination findings remained unchanged during 2010.  (Tr. 313-361.)

Williams presented to Dr. Mahna on eighteen (18) occasions in 2011, consistently complaining of lower back pain and stiffness with intermittent radiation, weakness in his lower back and right leg, and tingling across his lower back.  (Tr. 362-401.)  In January 2011, Williams reported recent epidural injections and the TENS unit had helped relieve his pain.  (Tr. 362-367.)  Physical therapy, however, had made his back pain worse, and Dr. Mahna recommended home exercises.  (Tr. 368-371.)  Right SI joint injections were recommended by Williams' pain management specialist, but authorization was denied.  (Tr. 372-376.)

In March 2011, Dr. Mahna noted paravertebral tenderness at L3-S1, mild muscle spasm, restricted range of motion, positive Faber sign on the right, sluggish right achilles and right patellar reflexes, weakness of the bilateral hip and knee movers, and equivocal straight leg raise on the right.  (Tr. 373.)  The following month, Dr. Mahna also noted weakness of the left EHL.

5

(Tr. 375.)  Dr. Mahna noted similar examination findings through June 2011.[2]  (Tr. 377-384.)

Williams returned to Dr. Mahna in September 2011 after a three month absence during which he was incarcerated for misdemeanor assault.  (Tr. 385.)  Williams reported receiving pain medication while incarcerated.  (*Id*.)  He complained of ongoing aching low back pain (8/10) with radiation, as well as stiffness and weakness in his lower back and right leg.  (*Id*.)  Dr. Mahna noted paravertebral tenderness at L4-S1; mild muscle spasm; some restriction of range of motion; absent focal muscular atrophy; weakness of bilateral hip, flexors, quadriceps and left EHL; symmetrical deep tendon reflexes except for sluggish left patellar reflex; negative straight leg raise; and negative ankle clonus.  (Tr. 386.)  He requested authorization for an MRI of Williams' lumbar spine.  (Tr. 387.)

On October 10, 2011, Williams underwent an MRI which showed (1) "a very tiny left paramedian disc herniation measuring 1 mm" at T12-L1 only slightly indenting the left anterior thecal sac; (2) unremarkable L1 and L2 discs; (3) mild disc degeneration and broad-based disc bulge at L3-4 causing mild central canal narrowing and anterior thecal sac flattening; (4) mild facet arthropathy at L3-4; (5) mild diffuse disc bulge and facet arthropathy at L4-5 causing mild central canal narrowing; (5) mild disc degeneration and broad-based disc bulge at L5-S1 causing slight anterior thecal sac flattening.  (Tr. 394, 447.)

Williams presented to Dr. Mahna thirteen (13) times in 2012, chiefly complaining of chronic low back pain radiating into the bilateral buttocks and thighs down to his knees.  (Tr. 402-428.)  On January 9, 2012, Williams underwent an x-ray of his lumbar spine that showed disc space narrowing through the lumbar spine; and a "minimal 2 mm anterior subluxation L4

---

[2] Dr. Faber did not note positive Faber signs in subsequent treatment notes.

and L5 with flexion." (Tr. 405.)  Treatment notes from January 12, 2012 indicate one of

Williams' physicians, Dr. Nicholas Ahn, determined Williams was not a good candidate for

surgery and recommended pain management instead.  (Tr. 402.)  Through February and March

2012, Williams complained of ongoing, aching, pulling, shooting, and radiating low back pain

which he rated a seven through eight out of ten.  (Tr. 404-412.)  In April 2012, Williams reported

that "everything is still the same." (Tr. 415.)  A random urine drug test report was negative for

opiates but positive for cannabinoids.  (Tr. 416.)  Dr. Mahna discontinued Williams'

prescriptions for Vicodin and Flexeril, and limited Williams to Motrin.  (*Id.*)  Examination

findings throughout this period were unchanged from his September 2011 visit.  (Tr. 402-416.)

After a three month gap in treatment, Williams returned to Dr. Mahna on July 12, 2012.

(Tr. 417-418.)  He raised the same pain complaints, and also reported "more pain in the left thigh

and . . . 'Charlie Horses.'" (*Id.*)  Dr. Mahna again noted unchanged examination findings,

including negative straight leg raise, mild muscle spasm, nonantalgic gait, tenderness at L4-S1,

some restriction of range of motion, sluggish left patellar reflex, and weakness of the bilateral

hip flexors, quadriceps, and left EHL.  (*Id.*)  Williams reported increased pain in October 2012,

along with continued "Charlie Horses" in his left thigh.  (Tr. 421-422.)  Dr. Mahna prescribed

Motrin 600 mg and Flexeril.  (*Id.*)

On November 8, 2012, Williams presented to Bhupinder Sawhny, M.D., for evaluation of

his low back pain.  (Tr. 615-616.)  Williams complained of chronic low back pain with radiation

at times into the lateral aspect of the right hip and lateral aspect of the thighs to the knee on both

sides.  (*Id.*)  He stated the pain was constant, worse with sitting, and not significantly relieved by

pain medication, physical therapy, or epidural blocks.  (*Id.*)  On examination, Dr. Sawhny noted

Williams was "in significant distress." (*Id.*)  He had normal muscle tone, grade 5/5 strength in all four extremities, 2+ deep tendon reflexes, and intact sensory function. (*Id.*)  Dr. Sawhny also found tenderness of the lumbar spine over the sacroiliac joints, restricted lumbar range of motion, and "straight leg raising caus[ing] low back pain bilaterally at about 45 degrees." (*Id.*)  He interpreted the MRI of Williams' lumbar spine as showing "no significant abnormality . . . and certainly no surgical lesion here." (*Id.*)  He diagnosed chronic lumbosacral radiculopathy, and found Williams "is a good candidate for a trial with a dorsal column stimulator." (*Id.*)  Dr. Sawhny noted Williams would need a psychiatric evaluation prior to dorsal column stimulator implantation. (*Id.*)

In November 2012, Dr. Mahna noted complaints of increased right sided lower back pain and numbness in the lateral aspect of both hands and left shoulder area. (Tr. 423.)  He sought authorization for a psychiatric evaluation, as well as for physical therapy three times per week for two weeks to include ultrasound, heat, massage, and electric stimulation. (Tr. 424.)  Treatment notes from December 2012 indicate Williams was participating in physical therapy. (Tr. 427-428.)

Williams continued to present regularly to Dr. Mahna throughout 2013, seeing him on twenty-four (24) occasions. (Tr. 461-502, 514-521.)  Williams complained of ongoing low back pain radiating into the bilateral buttocks and thighs down to his knees, stiffness in his lower back, right knee "wanting to give out at times," intermittent numbness of the right lumbar area, and worsening of symptoms with sitting, walking, and bending. (*Id.*)  He also complained of numbness in both hands ("on and off") and, beginning in April 2013, tingling in the right shoulder area. (*Id.*)  Dr. Mahna noted the follow examination findings during each visit in 2013:

nonantalgic gait; paravertebral tenderness at L4-S1; mild muscle spasm; some restriction of range of motion; weakness of the bilateral hip flexors, quadriceps, and left EHL; symmetrical deep tendon reflexes except for sluggish left patellar reflexes; negative straight leg raise; and negative ankle clonus.  (*Id*.)  Beginning in September 2013, Dr. Mahna also noted "right patellar reflex appears sluggish today compared to the left."  (Tr. 495-502, 514-521.)  Williams was prescribed Tylenol #3 with Codeine, and Flexeril throughout most of 2013.  (Tr. 471-502, 514-521.)

On September 19, 2013, Williams underwent an x-ray of his lumbar spine.  (Tr. 503.) This x-ray revealed as follows: "The sacroiliac joints, as visualized, appear unremarkable.  There is mild anterolisthesis of L4 on L5.  There is end-plate hypertrophic spurring.  Flexion image exaggerates the grade I spondylolisthesis at the L4-5 level which measures approximately 3 mm. The grade I spondylolisthesis partially normalizes on the extension upright image."  (*Id.*)  Dr. Mahna requested authorization for an additional allowance of a claim for L4/5 spondylolisthesis. (Tr. 498-500.)

On October 12, 2013, Williams was life-flighted to MetroHealth after a motorcycle accident.  (Tr. 556-557.)  Williams was riding the motorcycle without a helmet and was thrown over the handlebars.  (*Id*.)  He landed on his left hip and side.  (*Id*.)  He hit his head but did not lose consciousness and was ambulatory on scene.  (*Id.*) Williams complained of left lower abdominal pain, left flank pain, left shoulder pain, neck pain, and abrasions on his shoulder. (*Id*.) X-rays of Williams' pelvis and left shoulder were negative.  (Tr. 567.)  CT scans of his T-spine/L-spine and C-spine showed no fractures, but did reveal (1) "degenerative change with hypertrophic facet arthropathy particularly evident in the lower lumbar region; and (2) cervical

9

spondylosis between C4 and C7.  (Tr. 580.) Williams was diagnosed with contusions and

abrasions and discharged with a prescription for Percocet.[3]  (Tr. 560.)

In 2014, Williams presented to Dr. Mahna on twelve (12) occasions.  (Tr. 522-547.)

Williams' pain complaints were largely the same, and treatment records indicate he variously

rated his pain between an eight and ten on a scale of ten.  (*Id*.)  As in 2013, Williams also

consistently complained of numbness in both hands ("on and off") and tingling in his right

shoulder area.  (*Id*.)  Examination findings remained unchanged from 2013.[4]  (*Id*.)

On February 3, 2015, Dr. Mahna completed a Medical Source Statement regarding

Williams' Physical Capacity.  (Tr. 617-618.)  Dr. Mahna noted Williams suffered from disc

bulges at L3-4 and L5-S1 and spondylolisthesis at L4-5.  (*Id*.)  He characterized Williams' pain

as severe and found it interfered with Williams' concentration and took him off task.  (*Id*.)  Dr.

Mahna opined Williams could lift and carry no more than 10 pounds occasionally; stand/walk

for a total of 15-20 minutes during an eight hour workday; and sit for a total of 10-15 minutes

during an eight hour workday.  (*Id*.)  He determined Williams could only rarely climb, balance,

stoop, crouch, kneel, crawl, reach and push/pull.  (*Id*.)  Dr. Mahna concluded Williams needed to

be able to alternate between sitting, standing, and walking at will and, further, that he was

---

[3]  Williams returned to MetroHealth on October 30, 2013 to begin treatment for lumbago,
asthma, anemia, and vitamin D deficiency.  (Tr. 586-588.)  He also complained of
continued chest pain.  (Tr. 587.)  Williams underwent a CT of his chest on May 2, 2014
which showed a "tiny nodule in the right lung" and a new punctuate nodule in the left
lower lobe.  (Tr. 611.)  The report notes that the "clinical significance of these findings is
very unlikely."  (*Id*.)

[4]  Additionally, in June 2014, Williams returned to Dr. Sawhny.  (Tr. 614.)  Dr. Sawhny
noted Williams had successfully completed physical therapy without relief.  (*Id*.)  He
again determined Williams "is a candidate for a dorsal column stimulator."  (*Id*.)

restricted from heights, moving machinery, temperature extremes and "whole body vibrations." (*Id.*)  Finally, Dr. Mahna opined Williams required additional unscheduled rest periods during an 8 hour workday outside of a standard half hour lunch and two 15 minute breaks, and estimated these rest periods would occur "every couple of hours."  (*Id.*)

### 2. Mental Impairments

On June 5, 2013, Williams underwent a consultative psychological examination with Michael Faust, Ph.D.   (Tr. 449-456.)  Williams reported suffering from symptoms of depression and anxiety since his 2009 work injury.  (Tr. 451.)  He described his typical mood as "sad," and stated he had tearful episodes every few nights, difficulty sleeping, a suppressed appetite, low energy, feelings of helplessness, and difficulties with concentration.  (*Id.*) Williams complained of chronic back pain and sciatic nerve pain down his leg,[5] and indicated he worries "that the back surgery won't get approved and I'll never have another day without the pain."  (Tr. 450-451.) He stated he had never been psychiatrically hospitalized, and denied any previous mental health treatment or medication.  (Tr. 451.)

On examination, Dr. Faust noted Williams was alert, oriented, and cooperative.  (Tr. 452-453.)  He had no difficulties maintaining his focus and attention to the conversation at hand, or understanding questions or instructions.  (Tr. 452.)  Dr. Faust noted, however, that Williams' "level of attention/concentration throughout the interview was variable in that he struggled to stay focused and lost his train of thought while performing mental status tasks, but attended to the conversation at hand without observable difficulty."  (Tr. 452.)  In particular, Dr. Faust noted

---

[5]  Dr. Faust observed that Williams ambulated independently, but noted his "gait was slow and he limped," complained of pain, and shifted in his seat.  (Tr. 452.)

Williams "was unable to perform serial 7's because he became confused with the concept of the exercise after four numbers."  (Tr. 453.)  Additionally, Williams completed 7 digits forward and 3 backward, "indicating limited concentration."  (*Id*.)  Otherwise, Williams' thinking appeared logical and linear, and his insight and judgment was adequate.  (Tr. 452-453.)

Dr. Faust also found Williams had a "varied affect," noting "at times he fought back tears . . . [and] at other times he appeared anxious and shook his legs."  (Tr. 452.)  Williams reported anhedonia, sleep disturbance, decreased libido, and "rumination about his diminished quality of life."  (Tr. 452-453.)  Williams "demonstrated difficulty relating to others during [the] examination in that he was anxious and depressed, but he did remain cooperative."  (Tr. 454.)  Dr. Faust estimated Williams was functioning within the average range of intellectual ability.  (*Id*.)

Dr. Faust diagnosed adjustment disorder with mixed anxiety and depressed mood, and alcohol abuse.  (Tr. 454.)  He assessed a Global Assessment of Functioning ("GAF") of 55, indicating moderate symptoms.[6]  (*Id*.)  In terms of the four work-related mental abilities, Dr. Faust opined as follows:

> **1.  The claimant's mental abilities and limitations in understanding, remembering, and carrying out instructions.**

---

[6]  The GAF scale reports a clinician's assessment of an individual's overall level of functioning.  An individual's GAF is rated between 0-100, with lower numbers indicating more severe mental impairments.  A score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. A recent update of the DSM eliminated the GAF scale because of "its conceptual lack of clarity . . . and questionable psychometrics in routine practice."  *See Diagnostic and Statistical Manual of Mental Disorders* (DSM-5) at 16 (American Psychiatric Ass'n, 5th ed., 2013).

Mr. Williams had no difficulty understanding questions or instructions, including complex or multi-step instructions and he possessed adequate memory for his history.  He does not show any problems with comprehension and I estimate his IQ level to be in the average range.  While he is likely functioning within the average range of ability, his ability to remember instructions may be negatively affected by his lapses in attention.  His lapses in sustained attention may make it difficult for him to fully remember what he has been told.  Calvin may have difficulty remembering what needs to be done in the work place to follow through with completing tasks. * * *

**2. The claimant's mental abilities and limitations in maintaining attention and concentration, persistence, and pace to perform tasks and to perform multi-step tasks.**

Mr. Williams' level of attention/concentration throughout the interview was variable, and he tended to struggle to stay focused at times.  He was able to perform serial 7's slowly, but after a few numbers, he became confused and lost his train of thought.  He completed 7 digits forward and 3 backward, indicating a mild impairment in sustained concentration.  In sum, he showed some attention problems on mental status tasks today, but he attended to the conversation without difficulty.  Mr. Williams reports difficulty staying on task at home because of pain and distractibility and he reports a lack of persistence due to pain, poor energy, and depressed mood.

**3. The claimant's mental abilities and limitations in responding appropriately to supervision and to coworkers in a work setting.**

Although cooperative and polite, Mr. Williams appears depressed and anxious, feeling inadequate, worthless, and helpless. Today, Calvin was cooperative, but was somewhat difficult to engage.  He demonstrated difficulty relating to others during this examination due to his anxiety and depression.  Overall, he presented as a passive, depressed individual who was rather flat emotionally. He seemed tired, worried, in pain, and was emotionally constricted.  Thus rapport was difficult to establish.  He presents as having limitations in his ability to respond to others in the work place because of his adjustment disorder.

**4. The claimant's mental abilities and limitations in responding appropriately to work pressures in a work setting.**

Mr. Williams is not currently in counseling or being treated with psychiatric medications.  He described stressors in his life to include his inability to work, waiting for approval for back surgery, his "constant" pain, and financial stress. Exposure to work pressures may increase his depression and anxiety symptoms

13

and he does not have effective coping skills to manage emotional outbursts. * * (Tr. 454-455.)  Finally, Dr. Faust found Williams "does not appear to have the mental ability to manage his own funds if he is awarded such due to the likelihood of alcohol abuse."  (Tr. 456.)

In November 2014, Williams underwent an Initial Psychiatric Evaluation at the Charak Center for Health and Wellness, as part of the medical clearance process for implantation of a dorsal column stimulator.  (Tr. 548-555.)  Williams reported depression, anxiety, sleep disturbance, erratic appetite, decreased energy, and impaired concentration.  (Tr. 548.)  On mental status examination, Williams was cooperative with average eye contact and motor activity, clear/normal speech, and normal thought content, perception, and memory.  (Tr. 552-553.)  His thought process was logical, his mood was euthymic, and his affect was full.  (Tr. 553.)  He showed average insight and fair judgment.  (*Id*.)  The examiner, whose signature is illegible, diagnosed adjustment disorder with depressed mood, and assessed a GAF of 55, indicating moderate symptoms.  (Tr. 554.)  Williams was psychiatrically cleared for dorsal column stimulator placement.  (*Id*.)

**C.     State Agency Reports**

**1.     Physical Impairments**

On July18, 2013, state agency physician Leon Hughes, M.D., reviewed Williams' medical records and completed a Physical Residual Functional Capacity ("RFC") Assessment. (Tr. 85-87.)  He concluded Williams could lift and/or carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk for about six hours in an eight hour workday; and sit for about six hours in an eight hour workday.  (*Id*.)  Dr. Hughes further found Williams could not operate foot pedals or climb ladders, ropes or scaffolds.  (*Id*.)  Williams could, however,

14

occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl.  (*Id.*)  Finally, Dr.

Hughes found Williams should avoid concentrated exposure to extreme cold, wetness,

humidity, and hazards.  (*Id.*)

On August 18, 2013, state agency physician Leslie Green, M.D., reviewed Williams'

records and completed a Physical RFC Assessment.  (Tr. 113-115.)  Dr. Green reached the same

conclusions as Dr. Hughes, except she found Williams could frequently (as opposed to

occasionally) balance.  (*Id.*)

### 2.    Mental Impairments

On July 13, 2013, state agency physician Jennifer Swain, Psy.D., reviewed Williams'

medical records and completed a Psychiatric Review Technique ("PRT") and Mental RFC

Assessment.  (Tr. 84, 87-89.)  In the PRT, Dr. Swain found Williams was moderately limited in

his activities of daily living, social functioning, and ability to maintain concentration,

persistence, or pace.  (Tr. 84.)  In the Mental RFC Assessment, Dr. Swain found Williams was

moderately limited in his abilities to:

   (1) understand, remember, and carry out detailed instructions;

   (2) maintain attention and concentration for extended periods;

   (3) perform activities within a schedule, maintain regular attendance, and be punctual
   within customary tolerances;

   (4) sustain an ordinary routine without special supervision;

   (5) make simple-work related decisions;

   (6) complete a normal workday and workweek without interruptions from
   psychologically based symptoms and perform at a consistent pace without an
   unreasonable number of number and length of rest periods;

   (7) interact appropriately with the general public;

(8) ask simple questions or request assistance;

(9) accept instructions and respond appropriately to criticism from supervisors;

(10) get along with coworkers or peers without distracting them or exhibiting behavioral extremes;

(11) respond appropriately to changes in the work setting;

(12) set realistic goals or make plans independently of others; and

(13) work in coordination with or in proximity to others without being distracted by them.

(Tr. 87-89.)  In the narrative section of the form, Dr. Swain explained Williams was limited to

simple routine tasks due to variable attention, superficial interactions due to anxiety and

depression, and no strict production quotas and relatively static duties.  (*Id.*)

On August 21, 2013, Karla Voyten, Ph.D., reviewed Williams' mental records and

completed a PRT and Mental RFC Assessment.  (Tr. 112, 114-116.)  Dr. Voyten agreed

Williams was moderately limited in his activities of daily living, social functioning, and ability

to maintain concentration, persistence, or pace.  (Tr. 112.)  In the RFC Assessment, she found

fewer limitations than Dr. Swain, finding Williams was moderately limited in his abilities to:

 (1) understand, remember, and carry out detailed  instructions;

(2) maintain attention and concentration for extended periods;

(3) complete a normal workday or workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number of number and length of rest periods;

(4) interact appropriately with the general public;

(5) respond appropriately to changes in the work setting; and

(6) set realistic goals or make plans independently of others.

(Tr. 114-116.)  Dr. Voyten found Williams was limited to simple, routine tasks due to variable attention; superficial interactions with others, including the general public; and tasks not requiring strict production quotas or sustained close attention.  (*Id*.)

### D.    Hearing Testimony

During the February 5, 2015 hearing,[7] Williams testified to the following:

- He completed high school and earned degrees in culinary arts, computer networking engineering, and computer network administration.  (Tr. 39.)

- He is married but has been separated from his wife for 15 years. (Tr. 39.)  He lives in a two-story house with his aunt.  (Tr. 37-38.)  His room is on the first floor.  (*Id*.)

- He cannot work because he is "in pain twenty four hours a day."  (Tr. 40-41.)  He rated the pain an 8 or 9 on a scale of ten.  (*Id*.)  The pain is in his lower back and buttock, and sometimes extends down the right side of his body to his knee and "travels through his body."  (*Id*.)  He takes Flexeril and Tylenol 3.  (*Id*.)  They help but effect his appetite and sleeping habits.  (*Id*.)

- He has tried physical therapy on three different occasions, but it "makes [him] hurt worse that I was before."  (Tr. 41.)  He is not doing physical therapy now.  (*Id*.)  He wears both a back brace and a TENS unit for eight hours every day.  (Tr. 41, 48.)  He has not had surgery, but his doctor is recommending implantation of a neurostimulator.  (Tr. 42.)

- He can stand for 10 minutes, walk 50 to 100 feet, and sit for 20 minutes.  (Tr. 42-43.)  He can lift 10 to 15 pounds. (Tr. 43.)  He cannot bend, stoop, or squat on a regular basis. (Tr. 42-43.)  His most comfortable position is leaning forward while sitting.  (Tr.  49.)  He has trouble sleeping, and typically gets no more than four hours of sleep per night.  (Tr. 45.)

- He has depression and finds it "hard to get motivated."  (Tr. 44.)  He just recently saw a psychologist.  (*Id*.)  He has no problems with crowds or strangers.  (Tr. 44-45.)

---

[7] At the outset of the hearing, the ALJ dismissed Williams' request for hearing for the period between his alleged onset date of May 2009 to the date of the prior ALJ decision dated January 26, 2012 and stated that he would be "considering only the more recent period commencing January 27, 2012."  (Tr. 35.)

17

- He spends a typical day watching television.  (Tr. 46.)  He can shower, wash his hair, shave, and get dressed.  (*Id*.)  He does the vacuuming and laundry, but his aunt does the cooking and shopping.  (*Id*.)  He has a driver's license and can drive.  (Tr. 39.)  Sometimes he visits with relatives and friends, but not often.  (Tr. 46.)  He used to enjoy horseback riding but can no longer do it.  (Tr. 47.)  He does go to church.  (Tr. 48.)

The VE testified Williams had past work as a heat treater (medium, semiskilled, SVP 4); hand packager (medium but performed as very heavy, unskilled, SVP 2); cashier/checker (light but performed as medium, semiskilled, SVP 3); filter assembler (light but performed as heavy to very heavy, unskilled); housekeeper (light, unskilled); assistant manager (light but performed at very heavy, skilled, SVP 7); farm boss (light but performed as heavy, skilled, SVP 7); and candy molder (light, semiskilled, SVP 3).   (Tr. 51-52.)  The ALJ then posed the following hypothetical question:

I'll propose a hypothetical and ask you to assume an individual who at the time at the beginning of the indicated period was, let's see, was 40, 45.  And he's [now] age 52.  He has a greater than 12 year education with degrees, skills in culinary and computers as was testified here today.  As a background to which he testified.

This individual is limited to work of light exertional requirements, has additional non-exertional limitations.  Specifically, no climbing of ladders, ropes, or scaffolds.  Occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching, and crawling.  Frequent balancing.  No operation of foot controls.  No exposure to extreme cold, wetness, humidity, dangerous machinery, or unprotected heights.  And mental limitation that he perform routine tasks in a low stress environment.  Specifically no fast pace, strict quotas or frequent duty changes with superficial and/or personal interactions.

(Tr. 52-53.)

The VE testified the hypothetical individual would be able to perform Williams' past work as a housekeeper (both as described in the Dictionary of Occupational Titles ("DOT") and as performed) and filter assembler (as described in the DOT but not as performed).  (Tr. 53.)

18

The VE further explained the hypothetical individual would also be able to perform other representative jobs in the economy, such as small products assembler (light, unskilled), inspector and hand packager (light, unskilled), and electronics worker (light, unskilled).  (Tr. 54.)

The ALJ then posed a second hypothetical that was the same as the first but with the additional limitation that "due to symptoms from medically determinable impairments this individual would be off task at least 20 percent of the time."  (Tr. 54-55.)  The VE testified such an individual "would not be employable competitively."  (Tr. 55.)

Williams' counsel than asked the VE the following: "If I add to the judge's hypothetical that the individual would need a sit/stand option, changing position every 20 minutes, would the individual be able to perform light, the light work you identified or any of the past light work?" (Tr. 55.)  The VE testified the individual would not be able to perform Williams' past work, but would be able to perform the inspector and hand packager and electronics worker jobs as well as the job of mail clerk (light, unskilled).  (*Id*.)

### III.    STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).

A claimant is entitled to a POD only if: (1) he had a disability; (2) he was insured when

he became disabled; and (3) he filed while he was disabled or within twelve months of the date

the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

A disabled claimant may also be entitled to receive SSI benefits. 20 C.F.R. § 416.905;

*Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981). To receive SSI benefits,

a claimant must meet certain income and resource limitations. 20 C.F.R. §§ 416.1100 and

416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way

of a five-stage process. 20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4). *See also Ealy v.*

*Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923

(6th Cir. 1990). First, the claimant must demonstrate that he is not currently engaged in

"substantial gainful activity" at the time of the disability application. 20 C.F.R. §§ 404.1520(b)

*and* 416.920(b). Second, the claimant must show that he suffers from a "severe impairment" in

order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) *and* 416.920(c). A "severe

impairment" is one that "significantly limits . . . physical or mental ability to do basic work

activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful

activity, has a severe impairment that is expected to last for at least twelve months, and the

impairment, or combination of impairments, meets or medically equals a required listing under

20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of

age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d). Fourth, if

the claimant's impairment or combination of impairments does not prevent him from doing his

past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-

(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing

his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

Here, Williams was insured on the beginning of the unadjudicated period, January 27, 2012, and remained insured through March 31, 2013, his DLI.  (Tr. 20.)  Therefore, in order to be entitled to POD and DIB, Williams must establish a continuous twelve month period of disability commencing between these dates.  Any discontinuity in the twelve month period precludes an entitlement to benefits.  *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

### IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through March 31, 2013.

2. The claimant has not engaged in substantial gainful activity since January 27, 2012, the beginning of the unadjudicated period (20 CFR 404.1571 et seq., and 416.971 et seq.)

3. The claimant has the following severe impairments: degenerative disc disease; adjustment disorder with mixed anxiety and depressed mood; and alcohol abuse (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 416.920(d), 416.925, and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity (20 CFR 404.1545 and 416.945) to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b), except the claimant cannot climb ladders, ropes, or scaffolds; can occasionally climb ramps and stairs; can occasionally balance, stoop, kneel, crouch, and crawl; and can frequently balance; cannot operate foot controls; cannot be exposed to extreme cold, wetness, humidity, dangerous machinery, or unprotected heights; and is limited mentally to performing

routine tasks in a low stress environment (no fast pace, strict quotas, or frequent duty changes) involving superficial interpersonal interactions (20 CFR 404.1569a and 416.969a).

6.      The claimant is capable of performing past relevant work as a housekeeper and as a filter assembler.  This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

7.      Additionally, while the claimant is capable of performing past relevant work, there are other jobs existing in the national economy that he is also able to perform.  Therefore, the Administrative Law Judge makes the following alternative findings for step five of the sequential evaluation process.

8.      The claimant has not been under a disability, as defined in the Social Security Act, from the beginning of the unadjudicated period on January 27, 2012, through the date of this decision (20 CFR 404.1520(f), (g) and 416.920(f), (g)).

(Tr. 19-28.)

## V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)."  *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011).  Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make

credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.")  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do

not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); accord *Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  ANALYSIS

### Treating Physician Dr. Mahna

In his first assignment of error, Williams argues the ALJ failed to provide good reasons for rejecting Dr. Mahna's February 2015 opinion.  (Doc. No. 15.)  He asserts the ALJ's analysis is "cursory and inaccurate," arguing Dr.Mahna's opinion was supported by the October 2011 MRI and Dr. Sawhny's November 2012 evaluation.  (*Id.*)  Williams argues "the ALJ's rejection of Dr. Mahna's opinion, despite the aforementioned evidence of record and premised upon the lack of 'objective' evidence despite MRI findings, lacks specificity and fails to provide the good reasons necessary for giving a treating physician's opinion great deference."  (*Id.*)  Williams then asserts that "once appropriate weight" is given to Dr. Mahna's opinion, "substantial evidence proves that [he] does not have the residual functional capacity for light work," as found by the ALJ.  (*Id.*)  Finally, Williams argues the evidence (including Dr. Mahna's opinion) demonstrates he has the capacity for no more than sedentary work and, therefore, the medical-vocational guidelines establish his disability pursuant to 20 CFR Part 404, Subpart P, Appendix 2, Rule 201.14.  (*Id.*)

24

The Commissioner argues the ALJ properly discounted Dr. Mahna's opinion.  (Doc. No. 17.)  She emphasizes that, from 2009 through 2014, Dr. Mahna consistently reported relatively normal examination findings, including nonantalgic gait, no radicular symptoms, mild muscle spasm, and normal straight leg raising tests.  (*Id*.)  The Commissioner asserts "the ALJ reasonably found that [Dr. Mahna's] consistently unremarkable findings dating from [2009 to 2014] did not justify a deviation from the prior ALJ's physical residual functional capacity finding."  (*Id*. at 12.)  Thus, the Commissioner maintains that "the ALJ's decision cited legally and factually sufficient bases for finding that Dr. Mahna's Medical Source Statement was not [entitled] to great deference and his finding that Dr. Mahna's opinion was entitled to little weight should be affirmed."  (*Id*.)

The Commissioner then argues the medical evidence from the period at issue (i.e, from January 27, 2012 to the date of the decision) "did not support a deviation from the physical [RFC] finding in Plaintiff's prior case."  (*Id*.)  She maintains that "because the ALJ found that Dr. Mahna's February 2015 opinion was entitled to little weight, it cannot serve as an appropriate basis for a deviation from the [RFC] finding in Plaintiff's previously adjudicated case."  (*Id*. at 14.)  Finally, the Commissioner argues the grid rules do not apply to this case because the ALJ found Williams was capable of performing his past relevant work as a housekeeper and filter assembler.  (*Id*.)

A treating source opinion must be given "controlling weight" if such opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence in [the] case record."  *Meece v. Barnhart*, 2006 WL 2271336 at * 4 (6th Cir. Aug. 8, 2006); 20 C.F.R. § 404.1527(c)(2).

However, "a finding that a treating source medical opinion . . . is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009) (quoting Soc. Sec. Rul. 96-2p, 1996 SSR LEXIS 9 at *9); *Meece*, 2006 WL 2271336 at * 4 (Even if not entitled to controlling weight, the opinion of a treating physician is generally entitled to more weight than other medical opinions.)  Indeed, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927." *Blakley*, 581 F.3d at 408.[8]

If the ALJ determines a treating source opinion is not entitled to controlling weight, "the ALJ must provide 'good reasons' for discounting [the opinion], reasons that are 'sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007) (quoting Soc. Sec. Ruling 96-2p, 1996 SSR LEXIS 9 at * 5).  *See also Gayheart*, 710 F.3d at 376.  The purpose of this requirement is two-fold. First, a sufficiently clear explanation "'let[s] claimants understand the disposition of their cases,' particularly where a claimant knows that his physician has deemed him disabled and therefore 'might be bewildered when told by an administrative bureaucracy that she is not,

---

[8] Pursuant to 20 C.F.R. § 404.1527(c)(2), when not assigning controlling weight to a treating physician's opinion, the Commissioner should consider the length of the relationship and frequency of examination, the nature and extent of the treatment relationship, how well-supported the opinion is by medical signs and laboratory findings, its consistency with the record as a whole, the treating source's specialization, the source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other information in the case record relevant to the decision.

unless some reason for the agency's decision is supplied.'" *Id.* (quoting *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)).  Second, the explanation "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule."  *Wilson*, 378 F.3d at 544.  Because of the significance of this requirement, the Sixth Circuit has held that the failure to articulate "good reasons" for discounting a treating physician's opinion "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record."  *Rogers*, 486 F.3d at 243.

Nevertheless, the opinion of a treating physician must be based on sufficient medical data, and upon detailed clinical and diagnostic test evidence.  *See Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993); *Blakley*, 581 F.3d at 406.  The ALJ is not bound by conclusory statements of a treating physician that a claimant is disabled, but may reject such determinations when good reasons are identified for not accepting them.  *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984); *Duncan v. Secretary of Health & Human Servs.*, 801 F.2d 847, 855 (6th Cir. 1986); *Garner v. Heckler*, 745 F.2d 383, 391 (6th Cir. 1984).  According to 20 C.F.R. § 404.1527(d)(1), the Social Security Commissioner makes the determination whether a claimant meets the statutory definition of disability.  This necessarily includes a review of all the medical findings and other evidence that support a medical source's statement that one is disabled.  "A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled."  *Id*.  It is the Commissioner who must make the final decision on the ultimate issue of disability.  *Duncan*, 801 F.2d at 855; *Harris*, 756 F.2d at 435; *Watkins v. Schweiker*, 667 F.2d 954, 958 n. 1 (11th Cir. 1982).

As set forth above, in February 2015, Dr. Mahna offered an opinion regarding Williams' physical functional capacity.  (Tr. 617-618.)  He opined Williams could lift and carry no more than 10 pounds occasionally; stand/walk for a total of 15-20 minutes during an eight hour workday; and sit for a total of 10-15 minutes during an eight hour workday.  (*Id.*)  Dr. Mahna also found Williams could only rarely climb, balance, stoop, crouch, kneel, crawl, reach, and push/pull.  (*Id.*)  He determined Williams needed to be able to alternate between sitting, standing, and walking at will and, further, that he was restricted from heights, moving machinery, temperature extremes, and vibrations.  (*Id.*)  Finally, Dr. Mahna opined Williams required additional unscheduled rest periods during an eight hour workday outside of standard breaks, and estimated these rest periods would occur "every couple of hours."  (*Id.*)

At step four of the sequential evaluation process, the ALJ weighed Dr. Mahna's opinion as follows:

> The claimant's treating physician, Dr. Mahna, opined that the claimant can lift and carry 10 pounds occasionally; can stand and walk for 15-20 minutes; can sit for 10-15 minutes; can rarely perform postural maneuvers; can rarely reach, push, and pull; and has environmental limitations.  (Exhibit B11F). This opinion is given little weight because it is inconsistent with the objective medical evidence that shows only mild anterolisthesis and Grade I spondylolisthesis that partially normalizes on the extension upright image.

(Tr. 25.)  The ALJ then discussed the state agency physicians' opinions that Williams can perform a reduced range of light work, according them "significant weight" on the grounds they were "consistent with the record as a whole."  (Tr. 26.)

The ALJ formulated the following RFC[9]:

---

[9] At the outset of the decision, the ALJ determined he was bound by the holding of *Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 837 (6th Cir. 1997), in which the Sixth Circuit held an ALJ's factual determination regarding a claimant's residual functional

After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity (20 CFR 404.1545 and 416.945) to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b),[10] except the claimant cannot climb ladders, ropes, or scaffolds; can occasionally climb ramps and stairs; can occasionally balance, stoop, kneel, crouch, and crawl; and can frequently balance; cannot operate foot controls; cannot be exposed to extreme cold, wetness, humidity, dangerous machinery, or unprotected heights; and is limited mentally to performing routine tasks in a low stress environment (no fast pace, strict quotas, or frequent duty changes) involving superficial interpersonal interactions (20 CFR 404.1569a and 416.969a).

(Tr. 24.)

The Court finds the ALJ failed to articulate "good reasons" for rejecting Dr. Mahna's

opinion. The only reason provided by the ALJ is the alleged inconsistency between Dr.

Mahna's opinion and "the objective medical evidence that shows only mild anterolisthesis and

_____

capacity, made in connection with an ultimate finding of disability, was controlling with regard to an ALJ's subsequent determination of residual functional capacity for a later period, absent a showing of new and additional evidence or changed circumstances. Here, the ALJ determined Dr. Mahna reported "essentially the same findings in recent treatment records as the claimant exhibited in 2009, when he was initially injured." (Tr. 25.) Thus, he adopted the findings of the prior ALJ decision dated January 26, 2012 regarding Williams' residual functional capacity from his physical impairment of degenerative disc disease. (*Id.*) Williams does not contest the ALJ's application of *Drummond* in the instant appeal, arguing instead that the ALJ failed to provide "good reasons" for rejecting Dr. Mahna's February 2015 opinion. The Commissioner does not argue the applicability of *Drummond* negates the regulatory requirement that the ALJ provide "good reasons" for rejecting Dr. Mahna's opinion. Indeed, both parties proceed on the assumption that the ALJ is bound by the strictures of the treating physician rule with respect to Dr. Mahna's opinion. In the absence of any argument to the contrary, this Court will do the same.

[10] "Light work" is defined as follows: "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities."  20 CFR §404.1567(b).

Grade I spondylolisthesis that partially normalizes on the extension upright image."  (Tr. 25.)

This appears to be a reference to the September 2013 x-ray of Williams' lumbar spine.  The

Court finds the ALJ's reliance on this single x-ray to discredit the opinion of long-time treating

physician Dr. Mahna is insufficient to satisfy the "good reasons" requirement of the treating

physician rule, for several reasons.

First, the ALJ fails to articulate why this particular x-ray undermines the specific

restrictions set forth in Dr. Mahna's opinion.  The meaning of the x-ray findings (i.e., "mild

anterolisthesis and Grade I spondylolisthesis that partially normalizes on the extension upright

image") is not self-evident, nor is it clear to this Court that these findings are necessarily

inconsistent with Dr. Mahna's opinion.  Indeed, Dr. Mahna, Williams' long-time treating

physician, was well aware of the results of this x-ray and nonetheless opined severe physical

functional limitations.  Moreover, the ALJ fails to explain why this one piece of objective

medical evidence is of such significance in the context of the overall medical record.  Indeed,

the record contains a number of objective test results, including the October 2011 MRI of

Williams' lumbar spine and the October 2013 CT scan of Williams' T-spine/L-spine and C-

spine.  (Tr.  394, 447, 580.)  The ALJ does not acknowledge either of these objective test

results, both of which contain findings that could potentially support some or all of Dr. Mahna's

opinions.  Specifically, the October 2011 MRI showed broad-based disc bulge at both L3-L4

and L5-S1 with central canal narrowing and anterior thecal sac flattening; and the October 2013

CT scan revealed "hypertrophic facet arthropathy particularly evident in the lower lumbar

region" as well as cervical spondylosis between C4 and C7.  (*Id.*)  The ALJ did not address

these objective results and the Court cannot say with certainty that they are immaterial.[11]  Under these circumstances, the Court finds the ALJ's selective and unexplained reference to the September 2013 x-ray, standing alone, does not constitute a "good reason" for the rejection of Dr. Mahna's opinion.

The Commissioner emphasizes an earlier paragraph of the decision, in which the ALJ states:  "Dr. Mahna's examination findings indicate that the claimant has back pain with mild muscle spasm but no gait antalgia, no radicular symptoms, no straight leg raising abnormality, no motor weakness, no muscle atrophy, no sensory deficits, and no severe reflex abnormalities (Exhibits B2F, B5F, B7F)."  (Tr. 25.)  Even assuming the ALJ relied on these examination findings as a basis for rejecting Dr. Mahna's opinion, the Court finds this would not constitute a "good reason" in the absence of further explanation for the following reasons.

As an initial matter, the ALJ's characterization of Dr. Mahna's examination findings does not appear to be entirely accurate.  For example, the ALJ states Dr. Mahna's treatment notes indicate Williams had "no radicular symptoms." [12]  However, Dr. Mahna's treatment

---

[11] As noted *supra*, in November 2012, Dr. Sawhny reviewed the 2011 MRI and found it showed "no significant abnormality."  (Tr. 615-616.)  Despite this finding, Dr. Sawhny went on to diagnose Williams with chronic lumbosacral radiculopathy and recommended he undergo surgical implantation of a dorsal column stimulator.  (Tr. 615-616.)  While it is possible Dr. Sawhy's treatment note might provide support for the ALJ's rejection of Dr. Mahna's opinion, the ALJ does not discuss Dr. Sawhny's treatment notes at any point in the decision or otherwise identify those notes as providing a basis for discounting the opinion of Dr. Mahna.

[12] "Radicular pain is a type of pain that radiates into the lower extremity directly along the course of a spinal nerve root. . . .  The most common symptom of radicular pain is usually called sciatica or sometimes radiculopathy, which is pain that radiates along the sciatic nerve down the back of the thigh and sometimes into the calf and foot."  *See* http://www.spine-health.com/glossary/radicular-pain-and-radiculopathy.  *See also* https://www.ncbi.nlm.nih.gov/pubmed/15253601 ("Radicular pain is caused by irritation

records from 2012 to 2014 consistently record complaints of back pain "radiating into [Williams'] bilateral buttocks" and thighs/lower extremities down to his knees and/or calves. (Tr. 402-428, 461-502, 514-521, 522-547.)  Beginning in 2013, Williams also regularly complained of numbness in his hands and tingling in his right shoulder area.  (Tr.  475-502, 514-521, 522-547.)  Moreover, in November 2012, Dr. Sawhny expressly diagnosed Williams with chronic lumbosacral radiculopathy.  (Tr. 615-616.)  The ALJ does not explain the apparent discrepancy between these treatment records/diagnosis, and the statement in the decision that Dr. Mahna's treatment notes showed "no radicular symptoms."

Additionally, while the ALJ highlights Dr. Mahna's benign examination findings, the decision fails entirely to acknowledge the numerous positive examination findings in the record, most notably (1) Dr. Mahna's consistent findings of paravertebral tenderness; restricted range of motion; weakness of the bilateral hip flexors, quadriceps, and left EHL; and sluggish right patellar reflex; and (2) Dr. Sawhny's finding of a positive straight leg raise test in November 2012.  Courts have not hesitated to remand where an ALJ selectively includes only those portions of the medical evidence that places a claimant in a capable light, and fails to acknowledge evidence that potentially supports a finding of disability.  *See e.g., Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 724 (6th Cir.2014) (reversing where the ALJ "cherry-picked select portions of the record" rather than doing a proper analysis); *Germany–Johnson v. Comm'r of Soc. Sec.*, 313 Fed. App'x 771, 777 (6th Cir. 2008) (finding error where the ALJ was "selective in parsing the various medical reports").  *See also Ackles v. Colvin*, 2015 WL

---

of the sensory root or dorsal root ganglion of a spinal nerve. . . . Lumbar radicular pain is sharp, shooting or lancinating, and is typically felt as a narrow band of pain down the length of the leg, both superficially and deep." )

1757474 at * 6 (S.D. Ohio April 17, 2015) ("The ALJ did not mention this objective evidence and erred by selectively including only the portions of the medical evidence that placed Plaintiff in a capable light."); *Smith v. Comm'r of Soc. Sec.*, 2013 WL 943874 (N.D. Ohio March 11, 2013) ("It is generally recognized that an ALJ "may not cherry-pick facts to support a finding of non-disability while ignoring evidence that points to a disability finding."); *Johnson v. Comm'r of Soc. Sec.*, 2016 WL 7208783 (S.D. Ohio Dec. 13, 2016) ("This Court has not hesitated to remand cases where the ALJ engaged in a very selective review of the record and significantly mischaracterized the treatment notes."); *Taylor v. Comm'r of Soc. Sec.*, 2014 WL 1874055 at * 4 (N.D. Ohio May 8, 2014) (stating that it "is clear that an ALJ may not determine the RFC by failing to address portions of the relevant medical record, or by selectively parsing that record—i.e., 'cherry-picking' it—to avoid analyzing all the relevant evidence. This is particularly so when the evidence ignored is from a treating physician.)

Finally, while the ALJ summarized certain selected findings in Dr. Mahna's treatment notes,  he again failed to offer any *explanation* for his conclusion that Dr. Mahna's opinion was inconsistent with that evidence.  As noted *supra*, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."  *Fleischer*, 774 F.Supp.2d at 877.  *See also McHugh*, 2011 WL 6130824; *Hook,* 2010 WL 2929562.   Here, the ALJ failed to sufficiently articulate his reasoning for rejecting the opinion of Williams' long time treating physician, Dr. Mahna.

In sum, the Court finds the ALJ failed to set forth "good reasons" for rejecting the limitations assessed by Williams' treating physician.  Accordingly, the Court recommends a

33

remand is necessary, thereby affording the ALJ the opportunity to properly address the physical functional limitations assessed by Dr. Mahna.

Williams also argues that "once the appropriate weight" is given to Dr. Mahna's opinion, "substantial evidence proves that [he] does not have the residual functional capacity for light work," as found by the ALJ.  (Doc. No. 15.)  Williams also argues the evidence (most notably Dr. Mahna's opinion) demonstrates he has the capacity for no more than sedentary work and, therefore, the grid rules establish his disability pursuant to 20 CFR Part 404, Subpart P, Appendix 2, Rule 201.14.  (*Id.*)  Because both of these issues hinge on the weight given to Dr. Mahna's opinion and the ALJ's assessment of that opinion may change on remand, the Court will not address these arguments at this time.[13]

### Mental RFC Assessment

In his second assignment of error, Williams argues the ALJ's mental RFC findings are not supported by substantial evidence.  (Doc. No. 15 at 14-15.)  Specifically, he argues as follows:

> There is a stark inconsistency between the medical testimony, the vocational testimony, and the ALJ's conclusions.  Dr. Faust found that Mr. Williams has lapses in sustained attention that may interfere with his ability to fully remember what he has been told and what needs to be done and to follow through and complete tasks.  (Tr. 454-455.)  Mr. Anderson, the vocational expert at Mr. Williams' hearing, testified that there would be no jobs if the individual would be off task at least 20 percent of the time.  (Tr. 55.)  Despite the fact that the ALJ gave Dr. Faust's opinion great weight, the ALJ erred by not addressing or clarifying why he did not accept Dr. Faust's finding that Mr. Williams may have problems remembering, following through, and completing tasks.  (Tr. 26.)

---

[13] Aside from Dr. Mahna's opinion, Williams does not sufficiently point to other evidence in the record that supports his argument that he is limited to sedentary work.

(*Id.*)

The Commissioner argues substantial evidence supports the ALJ's mental RFC findings.  (Doc. No. 17.)  She maintains the ALJ properly accounted for Dr. Faust's findings by limiting Williams to work involving only routine tasks in a low stress environment involving no fast pace, no strict quotas, and no frequent duty changes.  (*Id.*)  The Commissioner further asserts Williams "does not explain how Dr. Faust's findings translate into greater limitations than those found by the ALJ."  (*Id.*)

Because "State agency medical and psychological consultants and other program physicians, psychologists, and other medical specialists are highly qualified," ALJs must consider their findings and opinions.  *See* 20 CFR § 404.1527(e)(2)(i).  When doing so, an ALJ "will evaluate the findings using the relevant factors in paragraphs (a) through (d) of this section, such as the consultant's medical specialty and expertise in our rules, the supporting evidence in the case record, supporting explanations the medical or psychological consultant provides, and any other factors relevant to the weighing of the opinions."  20 CFR § 404.1527(e)(2)(ii).  Finally, an ALJ "must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant or other program physician, psychologist, or other medical specialist" unless a treating physician's opinion has been accorded controlling weight.  *Id.*

However, opinions from non-treating sources, such as Dr. Faust, are not assessed for "controlling weight" and an ALJ is not required to provide "good reasons" for discounting all or part of a non-treating source opinion.  *See Gayheart*, 710 F.3d at 376 ("On the other hand, opinions from nontreating and nonexamining sources are never assessed for 'controlling

35

weight.'"); *Adams v. Colvin*, 2015 WL 4661512 at * 21 (N.D. Ohio Aug. 5, 2015) ("Dr. House

was not Adams' treating physician and, therefore, the ALJ was not required to satisfy the 'good

reasons' requirement in rejecting his opinion."); *Taylor v. Colvin*,, 2013 WL 6162527 at * 16

(N.D. Ohio Nov. 22, 2013) ("[T]he procedural 'good reasons' requirement does not apply to

treating physicians.").  Rather, all that is required is that an ALJ consider the findings and

opinions of state agency non-treating sources and explain in the decision the weight given to

such opinions.  *See* 20 CFR § 404.1527(e)(2)(ii).

Here, at step four, the ALJ discussed the medical evidence regarding Williams' mental

impairments as follows:

> The psychological consultative examiner, Dr. Faust, diagnosed the claimant with
> alcohol abuse and adjustment disorder with mixed anxiety and depression.  The
> claimant reported that his typical mood is sad.  He reported tearfulness every few
> nights.  He reported difficulties falling and remaining asleep.  He reported that he
> gets anxious and restless.  He reported that he feels helpless.  He reported that he
> withdraws from other people so that he does not get irritated with diminished
> quality of life.  The claimant also reported a history of 5 arrests for carrying an
> open container of alcohol.  Dr. Faust noted that the claimant appeared anxious
> and shook his legs.  Dr. Faust noted a varied affect.  (Exhibit B3F).  More
> recently, in November 2014, the claimant underwent a psychiatric evaluation as
> part of his preparation for receiving a spinal cord stimulator.  The claimant had a
> euthymic mood and a full affect (Exhibit B8F, p. 6).  The claimant's anxiety and
> depression symptoms preoccupy his mind and interfere with his sleep, resulting in
> diminished ability to focus his attention on detailed tasks.  The claimant's
> psychologically based symptoms also interfere with his ability to relate to others
> appropriately.  This limits the claimant to routine tasks in a low stress
> environment with no fast pace, strict quotas, or frequent duty changes.  The
> claimant can have superficial interpersonal interactions.

(Tr. 25.)

The ALJ then weighed Dr. Faust's opinion as follows:

> The psychological consultative examiner, Dr. Faust, opined that the claimant
> has moderate impairment in social and occupational functioning.  Dr. Faust
> opined that the claimant may have difficulty recalling what needs to be done in

> the workplace to follow through with completing tasks.  Dr. Faust opined that
> the claimant has limits in his ability to respond to others in the work place
> because of his adjustment disorder.  (Exhibit B3F).  This opinion is given great
> weight because Dr. Faust is a clinical psychologist and he conducted an in-
> person examination of the claimant.

(Tr. 26.)  The ALJ went on to discuss the state agency records-reviewing consultants' opinions,

both of which limited Williams to simple routine tasks, superficial social interactions, no strict

production quotas, and relatively static duties.  The ALJ accorded "great weight" to these

opinions on the grounds they were "consistent with the examination findings of Dr. Faust."

(*Id.*)

      As noted above, in the RFC, the ALJ found Williams was "limited mentally to

performing routine tasks in a low stress environment (no fast pace, strict quotas, or frequent

duty changes) involving superficial interpersonal interactions."  (Tr. 24.)

      The Court finds the ALJ did not err in his analysis of Dr. Faust's June 2013 opinion.

The decision discussed Dr. Faust's opinion of moderate impairment and specifically

acknowledged Dr. Faust's determination that Williams "may have difficulty recalling what

needs to be done in the workplace to follow through with completing tasks."  (Tr. 26.)  The ALJ

accommodated these limitations in the RFC by restricting Williams to "routine tasks in a low

stress environment (no fast pace, strict quotas, or frequent duty changes) involving superficial

interpersonal interactions."  (Tr. 24.)  Dr. Faust did not opine any specific limitations that are

clearly more restrictive than the mental limitations in the RFC.  The Court finds the analysis

provided by the ALJ, while cursory, satisfies the explanation requirement for non-treating,

examining psychologists and is supported by substantial evidence.[14]

Accordingly, the Court finds the ALJ did not err in his evaluation and analysis of Dr.

Faust's opinion.  Williams' second assignment of error is without merit.

### VII.    CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's

final decision be VACATED and the case REMANDED for further proceedings consistent with

this Report & Recommendation.


    */s Jonathan Greenberg*
Jonathan D. Greenberg
United States Magistrate Judge

Date: February 1, 2017


### OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**

-

---

[14] Williams appears to argue the ALJ should have interpreted Dr. Faust's report as opining that Williams would be off task at least 20% of the time.  (Doc. No. 15 at 14.) This argument is without merit, as Dr. Faust did not opine that Williams' memory and attention problems would result in him being off task 20% of the time.  Williams offers no support (either factual or legal) for the argument that the ALJ erred in failing to construe Dr. Faust's opinion in such a manner.